**EXHIBIT AO099**

## I. THE CONSTITUTIONAL DEFECT IS STRUCTURAL, NOT FACT-SPECIFIC

1. This case presents a question the Supreme Court has never been required to resolve: whether the Due Process Clause is violated when a judicial system is structured such that judges, prosecutors, court administrators, executive-branch agencies, and private defense counsel are all financially dependent upon a single, unified governmental funding structure that directly benefits when civil-rights claims are dismissed or limited.

2. The constitutional defect alleged here does not arise from bias, animus, or misconduct by any individual judge. It arises from systemic financial entanglement; a structural arrangement in which neutrality is institutionally impossible regardless of intent, good faith, or subjective impartiality.

3. The Due Process Clause requires more than the absence of proven actual bias. It requires the absence of structural conditions that create a constitutionally intolerable risk of bias. *Tumey v. Ohio*, 273 U.S. 510, 523 (1927). As the Supreme Court reaffirmed in *Caperton v. A.T. Massey Coal Co.*, 556 U.S. 868, 883–84 (2009) due process is violated when objective circumstances create a probability of bias "too high to be constitutionally tolerable", even without evidence of actual prejudice.

4. Here, the challenge is not to how discretion was exercised, but to whether lawful adjudicatory authority can exist at all within a system whose financial architecture aligns adjudication with fiscal self-interest. When the system itself profits from a particular litigation outcome, neutrality is not merely threatened, it is structurally foreclosed.

## II. WHAT EXISTING SUPREME COURT PRECEDENT DOES / DOES NOT ADDRESS

5. The Supreme Court's judicial-neutrality jurisprudence has developed along four distinct doctrinal axes:
    a. Direct Pecuniary Interest – *Tumey v. Ohio*, 273 U.S. 510 (1927);
    b. Institutional Bias – *Ward v. Village of Monroeville*, 409 U.S. 57 (1972);
    c. Accuser - Adjudicator Fusion – In *re Murchison*, 349 U.S. 133 (1955); and

    d. Probability of Actual Bias from Extreme Financial Influence – *Caperton v. A.T. Massey Coal Co.*, 556 U.S. 868 (2009).

6. Each of these doctrines addresses circumstances in which the source of bias is either personal to the adjudicator or external to the judicial system itself. In each case, the Court assumed a judicial structure in which courts are institutionally independent from the financial interests implicated by the litigation.

7. None of these precedents address a system in which:
   a. The judge's employer is financially interdependent with a party to the litigation;
   b. The employer participates in a shared public entity risk pool that funds and monitors the defense;
   c. Defense counsel reports to, and coordinates with, that risk pool regarding civil rights litigation;
   d. The same unified funding structure pays judges, prosecutors, court administrators, executive branch agencies, and private defense counsel; and
   e. Dismissal of civil rights claims yields system wide financial benefit through preserved reserves and reduced pooled contributions.

8. This means that existing precedent presumes that financial interests affecting adjudication are external pressures on an otherwise independent court. This case presents the opposite condition: a judicial system in which adjudication, defense, insurance, and administration operate within a single, financially interdependent structure.

9. Existing precedent presumes a fundamental institutional firewall: that the courts are institutionally independent from the financial interests implicated by the litigation. None of these cases presumed a system in which adjudication, defense, insurance, and administration operate within a single, financially interdependent structure.

10. The Supreme Court has never been required to address whether due process tolerates an arrangement where the judicial employer operates as a co-insured within a defense monitoring risk pool. The constitutional principle animating all due process cases is clear: a tribunal cannot be neutral when the system itself profits from a particular litigation outcome. This case forces that foundational principle onto a novel factual architecture.

11. This case therefore falls outside existing doctrinal categories while implicating the same constitutional principle that animates them all; whether a tribunal can be neutral when the system itself profits from a particular litigation outcome.

12. The Supreme Court has never addressed whether due process tolerates such an arrangement.

### III. THE UNIFIED FUNDING STRUCTURE AT ISSUE

13. State judges are employed by county governments, receiving compensation, benefits, and operational support from county funding units. Those same funding units are the members/insureds of the Michigan Municipal Risk Management Authority (MMRMA).

14. The record establishes the following uncontested facts, each documented by Defendants' own admissions, records, and public representations.

### Judicial Employment by County Governments

15. State judges are employed by county governments. Their compensation, benefits, and operational support are provided by county funding units.

### County Participation in a Shared Public Entity Risk Pool

16. Those same counties participate in a unified public-entity risk pool, the Michigan Municipal Risk Management Authority (MMRMA), which provides liability coverage for county governments and county-employed officials.

### Risk Pool Funding and Monitoring of Civil-Rights Defense

17. MMRMA funds and actively monitors the defense of civil rights litigation brought against member counties and their officials.

18. The defense counsel's sworn affidavit explicitly confirms this entanglement: 'Rosati, Schultz, Joppich, & Amtsbuechler P.C. represents the Allegan County Court's underlying funding unit which employs the Judges'. This is not a distant taxpayer interest; it is the *same institutional actor* in two different hats; one as the court's funder, the other as the financially interested litigant/insured within the risk pool.

19. Rosati, Schultz, Joppich, & Amtsbuechler P.C. billing entry dated May 27, 2025, states:
    a. "Correspondence to MMRMA Claims regarding federal lawsuit".

20. This entry confirms insurer involvement in strategy and oversight of Plaintiff's federal civil-rights case.

### Defense Counsel Coordination and Pre-Service Monitoring

21. Defense counsel coordinated with the risk pool regarding Plaintiff's federal lawsuit and billed $5,743.50 for monitoring that case.
22. Billing records expressly document monitoring occurring:
    a. "prior to our representation", and
    b. "prior to being properly served".
23. This establishes insurer directed surveillance of constitutional litigation before any defendant was formally before the court.

**Billing to the Same Funding Unit That Employs the Judges**

24. Defense counsel billed the same governmental funding unit that employs the judges adjudicating related matters.
25. In a sworn affidavit dated November 13, 2025, Attorney Alexandra L. Page stated, "RSJA represents the Allegan County Court's underlying funding unit which employs the Judges."
26. This admission establishes that the court, defense counsel, and insurer operate within the same unified fiscal structure.

**Pooled Financial Exposure Across Counties**

27. Financial exposure for civil rights liability is pooled across counties through MMRMA.
28. MMRMA publicly represents that it provides:
    a. "The broadest municipal liability coverage in the state",
    b. maintains "predictable member contributions", and
    c. is "committed to fiscal responsibility".
29. MMRMA further discloses that it created Greenstone Insurance, LLC, a captive insurance company, to "manage retained risk".

**System Wide Financial Benefit from Dismissal or Liability Limitation**

30. Dismissal or limitation of civil-rights claims:
31. Preserves MMRMA reserves;
    a. Stabilizes and reduces member contributions; and
    b. Benefits all participating counties, including the county that employs the presiding judge.
32. This is not a chain of speculation.
33. It is a single, unified fiscal organism.

34. The Due Process Clause does not permit adjudication where the judge's employer has a direct institutional interest in the outcome of the case. *Ward v. Village of Monroeville*, 409 U.S. 57, 60 (1972). Here, that interest is not isolated or incidental; it is embedded in the funding architecture of the judiciary itself.

35. The argument that the financial benefit is 'remote' or 'attenuated' misapplies the standard for *structural* due process. The alignment here is not a generalized civic interest; it is an institutional arrangement where the *adjudicating entity's employer* is a member of a self-insurance pool explicitly committed to minimizing payouts to ensure 'predictable member contributions' and 'maintain reserves'. The benefit is direct to the institutional funder of the court system, not a remote byproduct of a healthy economy. *Ward* and *Tumey* do not require a judge to receive cash under the table; they forbid the system that creates the 'probability of bias' as 'too high to be constitutionally tolerable'".

36. Existing precedent presumes a fundamental institutional firewall: that the courts are institutionally independent from the financial interests implicated by the litigation. *None* of these cases presumed a system in which adjudication, defense, insurance, and administration operate within a single, financially interdependent structure.

37. The Supreme Court has never been required to address whether due process *tolerates* an arrangement where the judicial employer operates as a co-insured within a defense monitoring risk pool. The constitutional principle animating all due process cases is clear: a tribunal cannot be neutral when the system itself profits from a particular litigation outcome. This case forces that foundational principle onto a novel factual architecture.

## IV. THE EVIDENTIARY FOUNDATION

38. Unlike typical bias allegations that depend on inference or speculation, the structural conflict at issue here is established by Defendants' own sworn admissions, billing records, contracts, and public representations. These materials are undisputed and originate entirely from Defendants themselves, leaving no contested issue of fact as to the architecture of the financial and administrative system. The evidentiary record therefore establishes, as a matter of law, a unified structure incompatible with judicial neutrality.

### A. Sworn Admission Establishing Unified Funding

39. Attorney Alexandra L. Page, Esq., executed a sworn affidavit on November 13, 2025, stating, "RSJA represents the Allegan County Court's underlying funding unit which employs the Judges".

40. This admission is unequivocal. Defense counsel affirmatively acknowledged that her client is the same governmental funding unit that employs the judges presiding over matters involving the defendant county.

41. Under *Tumey v. Ohio*, 273 U.S. 510, 523 (1927) a tribunal is constitutionally infirm where the adjudicator's employer has a financial interest in the outcome. This sworn statement alone establishes structural financial entanglement fatal to due process.

**B. Financial Documentation Demonstrating Defense - Insurer Coordination**

42. Rosati, Schultz, Joppich, & Amtsbuechler P.C. billing records total $9,229.70, including $5,743.50 expressly attributed to monitoring Plaintiff's federal civil rights litigation. Those records document:

    a. Pre-service monitoring of Plaintiff's federal case, prior to representation and prior to service;

    b. Coordination with MMRMA's claims unit, including an entry dated May 27, 2025 stating, "Correspondence to MMRMA Claims regarding federal lawsuit";

    c. Characterization of Plaintiff's constitutional litigation as "retaliatory"; and

    d. Billing to the same unified governmental funding structure that employs the judges.

43. These entries establish that defense counsel monitored Plaintiff's federal civil rights activity, coordinated strategy with the insurer, and billed the judicial funding unit for that activity; before any defendant was properly before the court.

**C. MMRMA's Publicly Stated Business Model**

44. MMRMA publicly represents that it provides: "The broadest municipal liability and property coverage in the state".

45. MMRMA further states: "Committed to fiscal responsibility, MMRMA maintains the reserves necessary for future obligations while ensuring predictable member contributions, even in changing markets".

46. MMRMA also discloses that it: "Formed Greenstone Insurance, LLC, a captive insurance company… to manage retained risk".

47. By its own description, MMRMA's business model depends on:

    a. Minimizing liability payouts;

    b. Maintaining reserve adequacy;

    c. Ensuring predictable member contributions; and

    d. Retaining and managing risk internally.

48. Every civil rights judgment against a member county directly threatens this model. The financial incentive to dismiss or limit liability is therefore institutional and systemic, not theoretical.

**D. Cross County Financial Interdependence**

49. An executed 10 year Interlocal Agreement (AO047) establishes that Ottawa County (the employer of Judge Karen J. Miedema) receives $15,000 annually, plus $125 an hour for time spent prosecuting cases for Allegan County, plus an additional $80 per case to cover administrative time and cost from Allegan County, a defendant in this action, for prosecutorial services.

50. This 10-year agreement creates a direct, recurring financial transfer from the defendant county to the judge's employing county.

51. When combined with shared MMRMA membership, this produces dual financial alignment:

    a. Direct alignment through annual interlocal payments; and

    b. Indirect alignment through pooled insurance exposure and shared reserve risk.

52. Ottawa County benefits financially when Allegan County avoids liability; both by preserving interlocal payment capacity and by protecting pooled insurance resources.

**E. Administrative Coordination Confirming Systemic Alignment**

53. Defense counsel's November 13, 2025, correspondence to the Allegan County Circuit Court Clerk states:

    a. "Once the appropriate time has passed, kindly ask Judge Miedema to sign same and return two true copies in the envelope provided."

54. The correspondence was copied to:

    a. Honorable Karen J. Miedema (c/o Mary Armbruster, Ottawa County Circuit Court)

55. This correspondence establishes:

    a. Ex parte coordination between defense counsel and court administration;

    b. Cross county administrative alignment (Allegan clerk → Ottawa court → Judge Miedema);

    c. A routine administrative custom, reflected in the language "kindly ask"; and

    d. Defense counsel directing judicial processing, including the timing and procurement of judicial signatures.

56. Judicial signatures are the mechanism by which court orders acquire legal force. Control over their timing and procurement reflects operational control over adjudicatory power.

### F. Evidentiary Conclusion

57. Taken together, these materials establish a documented, unified fiscal and administrative structure in which:

    a. Judges are employed by financially interested counties;

    b. Defense counsel is paid by the same funding unit as the court;

    c. Litigation strategy is coordinated with a shared insurer;

    d. Financial exposure is pooled across counties; and

    e. Court administration operates in alignment with defense direction.

58. This record establishes structural non-neutrality as a matter of law, not inference.

## V. WHY RECUSAL, DISCLOSURE, OR APPEARANCES CANNOT CURE THE DEFECT

59. The constitutional defect identified here is structural, not personal. Because it arises from the architecture of judicial funding and administration, it cannot be cured by recusal, disclosure, waiver, or reassignment.

### A. Individual Recusal Is Ineffective

60. Individual recusal cannot remedy a system-wide financial entanglement.

61. Every judge in Michigan is employed by either:

    a. A county that is a member of MMRMA; or

    b. A county that participates in a competing public entity risk pool with an identical financial structure and incentives.

62. Recusal from one judge to another therefore substitutes one financially interested adjudicator for another. The systemic financial interest remains unchanged.

63. The conflict is not individual to Judge Miedema. It is architectural, embedded in the statewide structure by which judges are employed, insured, and funded.

### B. Disclosure Does Not Eliminate Structural Bias

64. Disclosure of financial relationships does not cure constitutional infirmity.

65. The Supreme Court in *Caperton v. A.T. Massey Coal Co.* 556 U.S. 868, 883–84 (2009) rejected the notion that disclosure is sufficient where structural conditions create a probability of bias:
   a. "The difficulties of inquiring into actual bias… simply underscore the need for objective rules".
66. Knowledge of financial dependency does not eliminate that dependency. Where the structure itself creates incentives incompatible with neutrality, disclosure only confirms the constitutional violation, it does not resolve it.

### C. Structural Bias Is Non-Waivable

67. Structural bias affecting the tribunal's constitutional authority cannot be waived by the parties.
68. As the Supreme Court held in *Tumey v. Ohio,* 273 U.S. 510, 523 (1927):
   a. "[N]o man can be a judge in his own case… would be violated [regardless of consent]".
69. A tribunal that lacks constitutional neutrality lacks adjudicatory authority. Parties cannot confer constitutional jurisdiction by consent where the Constitution withholds it as a matter of structure.

### D. Assignment Within the Same System Provides No Cure

70. Reassignment within the same judicial system does not resolve the defect.
71. When all available judges are employed by counties that participate in the same risk pool, or share equivalent pooled financial exposure and incentives, reassignment merely perpetuates the same conflict in a different courtroom.
72. As Caperton (556 U.S. at 886) makes clear, where the risk of bias is structural, disqualification is required as a matter of law, not subject to discretionary, case by case balancing.
73. Here, recusal is functionally impossible because the conflict is system wide. No financially neutral tribunal exists within the system to which the case can be reassigned.

### E. Constitutional Consequence

74. Because the defect is structural and systemic, no procedural mechanism within the system can cure it. The Due Process Clause requires a neutral tribunal. Where the system itself forecloses neutrality, adjudication cannot constitutionally proceed.

75. This conclusion follows not from speculation or inference, but from the documented structure of judicial employment, insurance, and funding operating statewide.

## VI. THE ADMINISTRATIVE COMPONENT CONFIRMS SYSTEMIC ALIGNMENT

76. The constitutional violation is further confirmed by administrative conduct demonstrating that court operations functioned in coordination with defense interests, rather than as an independent judicial apparatus.

77. Defense counsel's written direction to court administration regarding the timing and procurement of judicial signatures outside formal docketing procedures does not reflect an isolated irregularity or clerical misstep. It reflects an administrative custom in which court personnel acted at the direction of defense counsel whose compensation and representation are financially tied to the same underlying funding unit as the court itself.

78. When court administrators, exercising delegated authority over judicial processing, act at the request of counsel financially aligned with the court's funding structure, the adjudicatory system ceases to function as an independent branch of government. It instead operates as an instrumentality of the defense.

### A. The Page Correspondence Establishes Administrative Direction by Defense Counsel

79. In Alexandra L. Page's November 13, 2025, correspondence, defense counsel instructed court administration:
    a. "Once the appropriate time has passed, kindly ask Judge Miedema to sign same and return two true copies in the envelope provided."

80. This instruction establishes that:
    a. Defense counsel dictated when judicial action should occur;
    b. Court administration was expected to procure judicial signatures at counsel's request;
    c. The process occurred outside the formal docketing and notice system; and
    d. The communication contemplated routine compliance, not judicial discretion ("kindly ask").

81. The correspondence was copied across county lines, evidencing inter-county administrative coordination involving the defendant county, the judge's employing county, and court staff.

### B. Administrative Custom, Not Isolated Error

82. The language used ("kindly ask") reflects an established and normalized practice, not an extraordinary request. There is no indication of objection, refusal, or procedural correction by court administration. The conduct reflects an administrative culture in which defense counsel could rely on court personnel to implement off docket judicial processing at counsel's direction.

83. Such conduct cannot be dismissed as harmless clerical activity. Judicial signatures are the mechanism by which court orders acquire legal force. Control over the timing and procurement of those signatures is control over adjudicatory power itself.

**C. Court Administrators as Final Policymakers Under Monell**

84. Court administrators act as final policymakers with respect to administrative processing, docketing, and order management. *Pembaur v. City of Cincinnati*, 475 U.S. 469, 483–84 (1986).

85. The Alexandra L. Page correspondence demonstrates that:
    a. Court administration implemented defense counsel's instructions;
    b. Judicial processing occurred off docket and without notice to Plaintiff;
    c. The practice was customary and routine, not anomalous; and
    d. The administrative custom operated across county lines, confirming institutional adoption.

86. Because this conduct was carried out by officials exercising final administrative authority, it constitutes municipal policy or custom for purposes of Monell liability.

**D. Structural Significance**

87. This administrative alignment supplies the causal mechanism linking the unified funding structure to the deprivation of Plaintiff's constitutional rights.

88. When:
    a. Defense counsel represents and is paid by the same funding unit that employs the judges;
    b. Court administrators act at defense counsel's direction;
    c. Judicial orders are processed outside formal procedures; and
    d. These practices are routine and institutionalized;

the tribunal is no longer independent in any meaningful constitutional sense.

89. The Due Process Clause does not permit adjudication by a system in which defense counsel can operationally direct court administration, particularly where all actors are financially dependent upon the same governmental funding structure.

## VII. PROPOSED CONSTITUTIONAL STANDARD

90. To reconcile modern governmental financing structures with the Due Process Clause, this Court should recognize the following principle:
    a. A tribunal is constitutionally non-neutral when its judges, administrative personnel, or adjudicatory processes are financially or administratively dependent upon a unified funding structure that includes parties or counsel appearing before it, such that the system itself benefits from a particular litigation outcome.

91. This standard does not create new constitutional law. It applies the settled logic of Tumey, Ward, Murchison, and Caperton to contemporary governmental systems in which adjudication, defense, insurance, and administration are financially interdependent.

## VIII. WHY CERTIFICATION IS REQUIRED

92. Certification under Federal Rule of Civil Procedure 5.1 and 28 U.S.C. § 1254(2) is required because this case presents a novel, purely constitutional question that cannot be resolved through ordinary adjudicatory means.

### A. The Question Presented Is Purely Constitutional

93. The issue before the Court is a question of constitutional law requiring no further factual development:
    a. All material facts are documented by Defendants themselves through sworn affidavits, billing records, contracts, and public statements;
    b. No credibility determinations are required;
    c. No evidence is disputed; and
    d. The sole question is whether the documented governmental funding structure violates the Due Process Clause.

94. The Court is not asked to weigh facts, infer intent, or assess subjective bias. It is asked to determine whether a conceded structural arrangement is constitutionally permissible.

### B. State Courts Are Institutionally Incapable of Resolving the Question

95. State courts cannot adjudicate this challenge because they operate within the very structure being challenged.

96. Every Michigan state judge is:
    a. Employed by a county government that is either a member of MMRMA or a functionally identical public entity risk pool;
    b. Financially linked to the same pooled insurance and funding mechanisms at issue; and
    c. Subject to the same institutional incentives and constraints alleged to violate due process.
97. This creates a structural impossibility of neutral state-court adjudication. A court cannot determine the constitutionality of a system when it is itself embedded within, and dependent upon, that system.

### C. The Issue Has Statewide Consequences

98. The constitutional question presented is not case specific. Its resolution affects:
    a. Every civil rights plaintiff suing Michigan counties or county employed officials;
    b. Every federal civil rights case involving Michigan state or local governmental defendants; and
    c. The integrity of adjudication in potentially thousands of cases annually, affecting millions of litigants over time.
99. Absent resolution, no litigant can be assured of a neutral tribunal when challenging county level governmental misconduct.

### D. The Question Has National Significance

100. Public entity risk pools and unified governmental insurance structures exist in all fifty states.
101. If Michigan's structure violates due process:
    a. Other states must reassess judicial employment models;
    b. Risk pool governance and funding mechanisms must be restructured; and
    c. Long standing assumptions about neutrality in government insured litigation must be corrected.
102. If Michigan's structure is held constitutional:
    a. *Tumey v. Ohio* is effectively nullified in the context of modern governmental insurance;

    b. The Due Process Clause loses operative force for civil rights plaintiffs suing government entities; and

    c. Neutral adjudication becomes structurally unavailable whenever governments self insure or pool risk.

103. Either outcome has consequences well beyond this case. Only the Supreme Court can supply a definitive answer.

### E. No Alternative Grounds for Resolution Exist

104. This case cannot be resolved on alternative grounds:

    a. State law grounds are unavailable because the claim is purely federal;

    b. Procedural grounds are unavailable due to a clean and complete record;

    c. Factual grounds are unavailable because all relevant facts are admitted or documented; and

    d. Individual bias grounds are unavailable because the challenge is structural, not personal.

105. Certification is therefore not discretionary - it is the only path to constitutional resolution.

## IX. JUDICIAL IMMUNITY CANNOT ATTACH TO A STRUCTURALLY VOID TRIBUNAL

106. Judicial immunity presupposes the existence of lawful judicial authority. It does not protect acts taken by a tribunal that is constitutionally incapable of adjudication. *Stump v. Sparkman*, 435 U.S. 349, 356–57 (1978).

107. Where a tribunal is structurally non-neutral in violation of the Due Process Clause, it acts without lawful adjudicatory power. In such circumstances, immunity does not attach, and resulting orders are void.

### A. Tumey – Judgments Issued by a Structurally Biased Tribunal Are Void Ab Initio

108. In *Tumey v. Ohio*, the Supreme Court held that a judgment rendered by a tribunal with a prohibited financial interest is void, not merely erroneous:

    a. "The judgment must be held void under the due process of law clause… since it would be difficult, if not impossible, for a defendant to show that [the adjudicator's financial interest] did not in fact affect the impartiality of the trial." *Tumey v. Ohio*, 273 U.S. 510, 535 (1927).

109. The Court did not inquire into actual bias. It held that structural non-neutrality itself deprives the tribunal of constitutional authority.

110. Accordingly, where due process is violated at the structural level, the resulting judgments are void ab initio, not voidable on appeal.

**B. Judicial Immunity Requires Jurisdiction and Constitutional Authority**

111. Judicial immunity is not absolute. It protects judges only when they act within the scope of lawful jurisdiction:

    a. "[A] judge will not be deprived of immunity because the action he took was in error… or was in excess of his authority; rather, he will be subject to liability only when he has acted in the 'clear absence of all jurisdiction.'" Stump, 435 U.S. at 356–57.

112. Here, the tribunal acted in the clear absence of constitutional jurisdiction, as established by the record:

    a. Structural Non-Neutrality
    b. Judge Miedema's employer, Ottawa County, had a direct financial interest in the outcome through:
    c. Membership in the same MMRMA risk pool as the defendant county; and
    d. A documented $15,000 annual interlocal payment, plus $125 per hour for time spent prosecuting cases for Allegan County, plus $80 per case for administrative fees and costs from Allegan County, a defendant.

113. Under Tumey and Ward, this institutional financial interest alone deprives the tribunal of constitutional authority to adjudicate.

**Administrative Coordination with the Defense**

114. Court administration processed judicial action at the direction of defense counsel, outside formal docketing procedures, and without notice to Plaintiff. This eliminated the independent adjudicatory function required of a court.

**Unified Funding Admission**

115. Defense counsel's sworn affidavit admits that RSJA represents "the [court's] underlying funding unit which employs the Judges". This establishes that the tribunal, its administrative apparatus, and defense counsel operated within the same fiscal structure.

116. When the adjudicatory system itself is constitutionally void, no individual judicial act performed within that system can claim immunity. Immunity cannot bootstrap authority that the Constitution withholds.

### C. Rule 60(b)(4): Void Judgments Must Be Set Aside

117. Federal Rule of Civil Procedure 60(b)(4) provides:
    a. "The court may relieve a party… from a final judgment… [when] the judgment is void."

118. A judgment is void when the court lacked constitutional authority to act. Structural deprivation of due process renders the tribunal without jurisdiction in the constitutional sense.

119. All orders issued by Judge Miedema are therefore void under Rule 60(b)(4) because:
    a. Structural financial entanglement deprived the tribunal of neutrality;
    b. Administrative coordination eliminated judicial independence; and
    c. The unified funding structure made impartial adjudication constitutionally impossible.

120. A system that never possessed constitutional authority to adjudicate cannot invoke judicial immunity to insulate its acts from review.

### X. QUESTION PRESENTED FOR CERTIFICATION

121. Whether the Due Process Clause of the Fourteenth Amendment is violated when:
    a. State judges are employed by county governments that participate in a unified public-entity risk pool (the Michigan Municipal Risk Management Authority ("MMRMA")), which publicly represents that it provides "the broadest municipal liability coverage in the state";

122. That risk pool:
    a. Covers the governmental defendants in the plaintiff's civil rights litigation;
    b. Pays defense costs through the same unified governmental funding structure that employs the judges;
    c. Operates under a business model expressly committed to "fiscal responsibility" through minimized liability payouts;
    d. Created a captive insurance company (Greenstone Insurance, LLC) to "manage retained risk"; and

   e. Maintains "predictable member contributions" by controlling and limiting liability exposure;

123. Defense counsel:
   a. Admits under oath that she represents "the court's underlying funding unit which employs the Judges";
   b. Monitors plaintiff's federal civil rights case prior to service and prior to representation;
   c. Bills the unified funding structure for surveillance of plaintiff's federal litigation ($5,743.50);
   d. Coordinates with the risk pool's claims unit regarding the federal lawsuit; and
   e. Characterizes plaintiff's federal filings as "retaliatory," reflecting governmental response to protected petitioning activity.

124. The presiding judge is employed by a county that:
   a. Is a member of the same public entity risk pool as the defendant county;
   b. Shares pooled liability exposure with the defendant county;
   c. Receives annual interlocal payments from the defendant county ($15,000 per year); and
   d. Benefits financially from dismissal or limitation of liability through reduced pooled insurance exposure and stabilized member contributions;

125. Court administration:
   a. Processes judicial orders at the ex parte direction of defense counsel;
   b. Coordinates administrative action across county lines; and
   c. Implements an established custom of off docket order procurement without notice to the plaintiff or compliance with governing court rules;
   d. Defendants demand that plaintiff pay the costs of monitoring plaintiff's federal civil rights litigation as a "condition of voluntary dismissal" that plaintiff never requested; and
   e. Structural financial entanglement makes recusal constitutionally impossible, because every state judge is employed by a county that participates in the same risk pool or a functionally identical public entity insurance structure, such that no financially neutral tribunal exists when a county government is sued for civil rights violations.

## XI. CONCLUSION

126. This case does not ask the Court to police individual bias.

127. It asks whether the Due Process Clause can survive modern governmental finance structures that entangle adjudication with fiscal self-interest.

128. If judges are paid by entities that profit when civil rights claims fail, neutrality is not merely threatened, it is structurally impossible.

129. In Tumey v. Ohio (273 U.S. at 523) the Supreme Court held that a mayor who received $12 per conviction could not constitutionally adjudicate criminal cases. The Court did not require proof of actual bias; it held that the financial structure itself violated due process.

130. Here, the record establishes far more substantial and systemic entanglement:
    a. The judge's employer shares a multi-million-dollar public entity risk pool with the defendant county;
    b. Defense counsel bills the "underlying funding unit which employs the Judges," as admitted under oath;
    c. The system profits from dismissal through preserved reserves and reduced insurance contributions;
    d. Court administration operates in coordination with defense counsel outside formal docketing procedures; and
    e. Recusal is structurally impossible because the conflict is system wide, not personal.

131. If Tumey's $12 violated due process, this documented fiscal organism (spanning judges, insurers, counties, administrators, and defense counsel) cannot withstand constitutional scrutiny.

132. The Constitution does not tolerate a judicial system in which justice and fiscal self-preservation occupy the same ledger.

133. This case presents a question of first impression.

134. The conflict is structural, admitted, and statewide in consequence.